# Authority of the Federal Bureau of Investigation To Override International Law In Extraterritorial Law Enforcement Activities

At the direction of the President or the Attorney General, the FBI may use its statutory authority to investigate and arrest individuals for violating United States law, even if the FBI's actions contravene customary international law.

The President, acting through the Attorney General, has the inherent constitutional authority to deploy the FBI to investigate and arrest individuals for violating United States law, even if those actions contravene customary international law.

Extraterritorial law enforcement activities that are authorized by domestic law are not barred even if they contravene unexecuted treaties or treaty provisions, such as Article 2(4) of the United Nations Charter.

An arrest that is inconsistent with international or foreign law does not violate the Fourth Amendment.

June 21, 1989

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum responds to the request of the Federal Bureau of Investigation ("FBI") that we reconsider our 1980 opinion that the FBI has no authority under 28 U.S.C. § 533(1) to apprehend and abduct a fugitive residing in a foreign state when those actions would be contrary to customary international law. *Extraterritorial Apprehension by the Federal Bureau of Investigation*, 4B Op. O.L.C. 543 (1980) (the "1980 Opinion" or "Opinion"). After undertaking a comprehensive review of the applicable law, we conclude that the 1980 Opinion erred in ruling that the FBI does not have legal authority to carry out extraterritorial law enforcement activities that contravene customary international law.

First, we conclude that, with appropriate direction, the FBI may use its broad statutory authority under 28 U.S.C. § 533(1) and 18 U.S.C. § 3052 to investigate and arrest individuals for violations of United States law even if those investigations and arrests are not consistent with international law. Second, we conclude that the President, acting through the Attorney General, has inherent constitutional authority to order the FBI to investigate and arrest individuals in a manner that departs from international law. The international law that may be abridged in this manner includes

163

not only customary international law but also Article 2(4) of the U.N. Charter and other unexecuted treaties or treaty provisions that have not become part of the domestic law of the United States. Finally, we reaffirm the conclusion of the 1980 Opinion that an arrest departing from international law does not violate the Fourth Amendment, and we further conclude that an arrest in violation of foreign law does not abridge the Fourth Amendment.[1]

We caution that this memorandum addresses only whether the FBI has the legal authority to carry out law enforcement operations that contravene international law. It does not address the serious policy considerations that may weigh against carrying out such operations.

## I. The 1980 Opinion

The 1980 Opinion addressed the legal implications of a proposed operation in which FBI agents would forcibly apprehend a fugitive in a foreign country that would not consent to the apprehension. That Opinion acknowledges that 28 U.S.C. § 533(1), the statute authorizing FBI investigations, contains no explicit geographical restrictions. It also refers to a previous opinion issued by this Office that concluded that the statute's general authorization to detect and prosecute crimes against the United States appears broad enough to include such law enforcement activity no matter where it is undertaken.[2] 4B Op. O.L.C. at 551. The 1980 Opinion asserts, however, that customary and other international law limits the reach of section 533(1). Under customary international law, as viewed by the 1980 Opinion, it is considered an invasion of sovereignty for one country to carry out law enforcement activities within another country without that country's consent. Thus, the Opinion concludes that section 533(1) authorizes extraterritorial apprehension of a fugitive only where the apprehension is approved by the asylum state. *Id.*

---

[1] The 1980 Opinion concluded that FBI agents who participate in overseas arrests in violation of international law might be subject to civil liability. Because we now conclude that FBI agents do have authority to engage in such actions, we do not believe they will be subject to civil liability. We do not discuss that issue in this memorandum, however, because the FBI agreed that our opinion concerning the FBI's substantive authority should precede any analysis of civil liability issues. *See* Memorandum for John O McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, from Margaret Love, Deputy Associate Attorney General (Mar 15, 1989).

The 1980 Opinion also addressed several other issues, including whether bringing a fugitive before the court by forcible methods would impair the court's power to try the fugitive. We agree with the 1980 Opinion's conclusion that, absent cruel or outrageous treatment, the fact that the fugitive was brought within the court's jurisdiction by means of forcible abduction would not impair the court's power to try the fugitive. *See Frisbie v Collins*, 342 U.S. 519 (1952); *Ker v. Illinois*, 119 U S. 436 (1886), *United States v. Toscanino*, 500 F.2d 267 (2d Cir 1974). We do not reconsider any issues addressed by the 1980 Opinion that are not specifically discussed in this memorandum.

[2] The referenced opinion is a June 8, 1978 Memorandum for the Counselor to the Attorney General, from the Deputy Assistant Attorney General, Office of Legal Counsel, on FBI investigative activities in a foreign country (the "1978 Opinion")

164

The Opinion supports this conclusion with "two distinct but related lines of analysis." *Id.* at 552. First, citing *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.), the Opinion concludes that the authority of the United States outside its territory is limited by the sovereignty of other nations. The Opinion does not explain the juridical source of this limitation on the authority of the United States. In *The Schooner Exchange*, however, Chief Justice Marshall relies on customary international law for many of his conclusions, and this part of the 1980 Opinion appears to suggest that customary international law imposes absolute jurisdictional limitations on the United States' lawmaking authority.

Second, the Opinion implicitly relies on the principle of statutory construction that statutes should be construed, when possible, so as to avoid conflict with international law. The Opinion notes that a statute imposing a duty ordinarily is construed to authorize all reasonable and necessary means of executing that duty. The Opinion concludes that although the law enforcement methods at issue may be necessary to carry out the FBI agents' duties under section 533(1), those methods are "unreasonable" and hence, unauthorized, if executed in violation of international law. Thus, the Opinion concludes that without asylum state consent, "the FBI is acting outside the bounds of its statutory authority when it makes an apprehension of the type proposed here — either because § 533 could not contemplate a violation of international law or because the powers of the FBI are delimited by those of the enabling sovereign." *Id.* at 553.

The 1980 Opinion's impact on the ability of the United States to execute necessary law enforcement operations may be significant. The reasoning of the 1980 Opinion would seem to apply to a broad range of law enforcement activities other than forcible apprehension. United States law enforcement agents frequently are required to travel to foreign countries to conduct investigative activities or to meet foreign informants. Formal consent cannot always be obtained from the foreign government, and indeed, in many cases to seek such consent would endanger both the agents and their investigation. Although such activities are less intrusive than forcible apprehension and removal of the fugitive, under the 1980 Opinion they nonetheless may be viewed as encroachments on the asylum state's sovereignty and hence, violations of international law, if not authorized by that state. *See* Ian Brownlie, *Principles of Public International Law* 307 (3d ed. 1979) ("Brownlie") ("Police or tax investigations may not be mounted ... on the territory of another state, except under the terms of a treaty or other consent given."); 6 Marjorie M. Whiteman, *Digest of International Law* 179-83 (1968) (describing incidents in which American authorities sought and received permission from host country to interview persons held in foreign custody and to examine records). Thus, the 1980 Opinion has the potential to preclude the United States not only from apprehending fugitives in foreign coun-

tries, but also from engaging in a variety of more routine law enforcement activities.

The United States is facing increasingly serious threats to its domestic security from both international terrorist groups and narcotics traffickers. While targeting the United States and United States citizens, these criminal organizations frequently operate from foreign sanctuaries. Unfortunately, some foreign governments have failed to take effective steps to protect the United States from these predations, and some foreign governments actually act in complicity with these groups. Accordingly, the extraterritorial enforcement of United States laws is becoming increasingly important to the nation's ability to protect its own vital national interests.

## II. Analysis

### A. The Scope of the FBI's Statutory Authority

The general investigative authority of the FBI derives from 28 U.S.C. § 533(1), which provides that "[t]he Attorney General may appoint officials to detect and prosecute crimes against the United States." This provision was first enacted in 1921 as part of the Department of Justice Appropriations Act, ch. 161, 41 Stat. 1367, 1411 (1921). As originally enacted, it also provided that the officials appointed by the Attorney General "shall be vested with the authority necessary for the execution of [their] duties." *Id.* This provision was carried forward in successive appropriations acts and received permanent codification in 1966. Pub. L. No. 89-554, § 4(c), 80 Stat. 378, 616 (1966). At that time, the reference to "necessary" authority was dropped as surplusage because "the appointment of the officials for the purposes indicated carries with it the authority necessary to perform their duties." H.R. Rep. No. 901, 89th Cong., 1st Sess. 190 (1965).

The FBI's arrest authority derives from 18 U.S.C. § 3052,[3] which provides:

> The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have rea-

---

[3] The 1980 Opinion did not discuss section 3052, apparently believing that section 533(1) also provided the authority for the FBI's power to make arrests

sonable grounds to believe that the person to be arrested
has committed or is committing such felony.

We believe, consistent with earlier opinions of this Office, that sections 533(1) and 3052 authorize extraterritorial investigations and arrests.[4] Section 533(1) has been described as granting "broad general investigative power." *United States v. Marzani*, 71 F. Supp. 615, 617 (D.D.C. 1947), *aff'd*, 168 F.2d 133 (D.C. Cir.), *aff'd*, 335 U.S. 895 (1948) (per curiam). Section 3052 confers an equally broad arrest power. Neither statute by its terms limits the FBI's authority to operations conducted within the United States.[5] Moreover, reading these sections as applying extraterritorially accords with Congress' intent to give certain criminal statutes extraterritorial reach.[6] In many statutes, Congress has extended the United States' substantive criminal jurisdiction extraterritorially. *See, e.g.*, 18 U.S.C. § 844(i) (enacting penalties for destruction of property used in foreign commerce); 18 U.S.C. § 1116(c) (implementing Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons); 18 U.S.C. § 1203(b)(1) (implementing Hostage Convention); 49 U.S.C. § 1472(l) (enacting penalties for carrying weapons or explosives aboard aircraft). These statutes are enforced principally by the FBI. In order for the FBI to have the authority necessary to execute these statutes, its investigative and arrest authority must have an equivalent extraterritorial scope.[7]

---

[4] Our 1978 Opinion concluded that section 533(1) authorized extraterritorial investigations, and our 1980 Opinion did not disagree with that conclusion.

[5] The Court repeatedly has held that Congress' intent to have its laws apply extraterritorially need not be explicitly stated where the statute involves the sovereign's ability to defend itself against crimes against the sovereign *See, e g , Blackmer v United States*, 284 U S 421, 437 (1932), *United States v. Bowman*, 260 U S. 94, 98 (1922).

[6] Courts frequently have held that Congress has the power to criminalize extraterritorial conduct, whether committed by American citizens or foreign citizens, if the conduct (i) threatens the country's security or interferes with governmental operations or (ii) is intended to have an illegal effect in the United States. *See e g , United States v Columba-Colella*, 604 F.2d 356, 359 (5th Cir 1979) (collecting cases), *United States v King*, 552 F 2d 833 (9th Cir. 1976), *cert denied*, 430 U.S. 966 (1977) As the Court held in *United States v Bowman*, criminal statutes that are enacted because of the government's right to defend itself *must* apply abroad, otherwise, "to limit their *locus* to the strictly territorial jurisdiction would ... greatly curtail the scope and usefulness of the statute " 260 U.S at 98 Although *Bowman* involved Congress' prescriptive power, the Court also applied this principle to an enforcement action in *Blackmer v. United States Blackmer* upheld a contempt citation against an American citizen residing in France who refused to appear as a witness in a criminal trial. The Court noted that the sovereign's power to protect itself would be meaningless if the court's enforcement powers were not coextensive with the legislature's power to criminalize the conduct *See* 284 U.S at 438-39

[7] Other considerations support this conclusion. As discussed *infra* at p. 172, a general enabling statute that confers broad authority on an agency to effectuate core executive functions should, absent explicit restriction, be read as conferring on the agency authority that is commensurate with the inherent executive functions it is effectuating Since the President's law enforcement authority has extraterritorial scope, the FBI's basic statutory authority should be read as having the same scope.

It has been suggested to us that because professional bail bondsmen lack power to arrest bail jumpers outside the territory of the United States, *see Kear v. Hilton*, 699 F 2d 181, 182 (4th Cir 1983), FBI agents

Continued

167

## B. The Effect of Customary International Law on the FBI's Extraterritorial Powers

The 1980 Opinion offers two bases for its conclusion that customary international law limits the FBI's extraterritorial powers. First, the Opinion asserts that the FBI's powers are delimited by those of the enabling sovereign and that the United States itself lacks the legal authority to take actions that contravene customary international law. The implication is that both Congress and the Executive are powerless to authorize actions that impinge on the sovereignty of other countries. Second, the Opinion concludes that the FBI's statutory authority must be read as constricted by the requirements of customary international law. We conclude that both bases for decision are erroneous.

### 1. Effect on the Sovereign's Power

The 1980 Opinion was clearly wrong in asserting that the United States is legally powerless to carry out actions that violate international law by impinging on the sovereignty of other countries. It is well established that both political branches — the Congress and the Executive — have, within their respective spheres, the authority to override customary international law. Indeed, this inherent sovereign power has been recognized since the earliest days of the Republic.

In *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116 (1812), Chief Justice Marshall explicitly stated that the United States has the authority to override international law. At issue was whether a French warship was immune from judicial process within the territory of the United States. Relying on customary international law, Marshall concluded that it was immune, but stated that the Court had followed these customary international law principles only in default of any declaration by the United States government that they were not to be followed:

> It seems then to the Court, to be a principle of public law, that national ships of war, entering the port of a friendly power open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction.

---

[7] (.. continued)
similarly lack extraterritorial arrest authority, regardless of whether the arrest violates international law. However, the arrest authority of professional bail bondsmen is derived from common law, *see Taylor v. Taintor,* 83 U.S (16 Wall ) 366, 371 (1872), and thus is amenable to judicial limitation; this does not suggest that the FBI's broad *statutory* authority under 28 U S C. § 533 and 18 U S.C. § 3052 may be similarly limited Indeed, because responsibility for the conduct of foreign relations is vested in the Executive, not private citizens, it is appropriate that the Executive's authority should extend extraterritorially, while the authority of bail bondsmen should be deemed restricted to the boundaries of the United States.

> Without doubt, *the sovereign of the place is capable of destroying this implication.* He may claim and exercise jurisdiction, either by employing force, or by subjecting such vessels to the ordinary tribunals. But until such power be exerted in a manner not to be misunderstood, the sovereign cannot be considered as having imparted to the ordinary tribunals a jurisdiction, which it would be a breach of faith to exercise.

*Id.* at 145-46 (emphasis added).[8]

Chief Justice Marshall unequivocally reaffirmed the validity of this principle in *Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814), in which he stated:

> This usage [the rule of customary international law] is a guide which the sovereign *follows or abandons at his will.* The rule, like other precepts of morality, of humanity, and even of wisdom, is addressed to the judgment of the sovereign; and although it cannot be disregarded by him without obloquy, yet *it may be disregarded.*

*Id.* at 128 (emphasis added). The understanding that the political branches have the power under the Constitution to exercise the sovereign's right to override international law (including obligations created by treaty) has been repeatedly recognized by the courts. *See The Paquete Habana,* 175 U.S. 677, 700 (1900) (courts must apply customary international law unless there is a treaty or a controlling executive or legislative act to the contrary); *The Chinese Exclusion Case,* 130 U.S. 581, 602 (1889) (noting that "[t]he question whether our government is justified in disregarding its engagements with another nation is not one for the determination of the courts"); *Diggs v. Shultz,* 470 F.2d 461, 466 (D.C. Cir. 1972) (stating that "[u]nder our constitutional scheme, Congress can denounce treaties if it sees fit to do so"), *cert. denied,* 411 U.S. 931 (1973); *Tag v. Rogers,* 267 F.2d 664, 668 (D.C. Cir. 1959) (concluding that "[w]hen, however, a constitutional agency adopts a policy contrary to a trend in international law or to a treaty or prior statute, the courts must accept the latest act of that

---

[8] In concluding that the United States does not have the legal authority to assert extraterritorial enforcement jurisdiction in violation of international law, the 1980 Opinion relies exclusively on a statement in *The Schooner Exchange* that the "power of a nation within its own territories, must be traced up to the consent of the nation itself. They can flow from no other legitimate source." 11 U S. (7 Cranch) at 136. However, this statement was made in connection with explaining that any restriction on an American court's jurisdiction over the foreign warship could not flow from an external source, but had to be based on domestic law. *Id* The statement thus provides no support for the 1980 Opinion's analysis. Moreover, the Opinion ignores the case's explicit recognition of the principle that a sovereign has the power to act inconsistently with customary international law.

agency"), *cert. denied*, 362 U.S. 904 (1960); *The Over the Top*, 5 F.2d 838, 842 (D. Conn. 1925) (stating that "[i]nternational practice is law only in so far as we adopt it, and like all common or statute law it bends to the will of the Congress"). Leading commentators also agree that the United States, acting through its political branches, has the prerogative to take action in disregard of international law.[9]

Indeed, the sovereign's authority to override customary international law necessarily follows from the nature of international law itself. Customary international law is not static: it evolves through a dynamic process of state custom and practice. States ultimately adhere to a norm of practice because they determine that upholding the norm best serves their long-run interests and because violation of the norm may subject the nation to public obloquy or expose it to retaliatory violations. *See Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814). States necessarily must have the *authority* to contravene international norms, however, for it is the process of changing state practice that allows customary international law to evolve.[10] As Chief Justice Marshall stated in *Brown*, "[t]he rule is, in its nature, flexible. It is subject to infinite modification. It is not an immutable rule of law, but depends on political considerations which may continually vary." 12 U.S. (8 Cranch) at 128. If the United States is to participate in the evolution of international law, the Executive must have the power to act inconsistently with international law where necessary. "It is principally the President, 'sole organ' of the United States in its international relations, who is responsible for the behavior of the United States in regard to international law, and who participates on her

---

[9] As Professor Henkin has noted, "the Constitution does not forbid the President (or the Congress) to violate international law, and the courts will give effect to acts within the constitutional powers of the political branches without regard to international law " Louis Henkin, *Foreign Affairs and the Constitution* 221-22 (1972). The Restatement also expressly maintains that Congress by subsequent enactment may supersede a rule of international law or international agreement. *See* Restatement (Third) of the Foreign Relations Law of the United States § 115(1)(b) (1987) ("Restatement (Third)"). The reporters' notes also agree that "[t]here is authority for the view that the President has the power, when acting within his constitutional authority, to disregard a rule of international law or an agreement of the United States." *Id* § 15(1)(b) note 3 While the Restatement (Third) does not explicitly address whether the President or his delegate may violate international law when acting pursuant to statutory rather than constitutional authority, this proposition appears to be a direct corollary to the Restatement (Third)'s conclusion with respect to legislative authority. If Congress has the authority to enact a statute contrary to international law, it may also enact a statute that delegates to the Executive authority that can be exercised contrary to international law Thus, we believe that the Restatement (Third) substantially agrees with our view that the political branches, under the authority of either constitutional or statutory domestic law, legally may act in a manner that is inconsistent with international law

[10] A recent example involves international territory and economic sovereignty over the seas In 1945, the contiguous sea outside the territorial sea (from three to twelve miles) was generally considered to be international waters *See* Brownlie, *supra*, at 218. Shortly thereafter, however, a number of states began asserting 200-mile fishery conservation zones *Id*. These claims were, at times, supported by military force. Sayre A. Swarztrauber, *The Three-Mile Limit of Territorial Seas* 152-77 (1972). The international law norm that waters beyond the territorial sea were not subject to the jurisdiction of the coastal states collapsed. Restatement (Third), *supra*, § 514(1)(a). By 1979, there was general acceptance of an exclusive economic zone of 200 miles Brownlie, *supra*, at 219-20.

behalf in the indefinable process by which customary international law is made, unmade, remade." Louis Henkin, *Foreign Affairs and the Constitution* 188 (1972). Thus, the power in the Executive to override international law is a necessary attribute of sovereignty and an integral part of the President's foreign affairs power. Indeed, the absence of such authority in the Executive would profoundly and uniquely disable the United States — rendering the nation a passive bystander, bound to follow practices dictated by other nations, yet powerless to play a role in shaping those practices.[11]

Thus, we think it clear that, contrary to the 1980 Opinion's assertions, customary international law does not impose absolute legal limits on the power of the United States to exercise its law enforcement jurisdiction in foreign countries. Both the Congress and the President, acting within their respective spheres, retain the authority to override any such limitations imposed by customary international law.

## 2. Effect on the FBI's Statutory Authority

We also believe that the 1980 Opinion erred in concluding that the statutes granting the FBI its investigative and arrest powers must be construed as limited by customary international law. The 1980 Opinion notes that a conventional rule of statutory construction states that where a statute prescribes a duty, by implication it authorizes all reasonable and necessary means to effectuate that duty. 4B Op. O.L.C. at 552. The Opinion concludes, based principally on the disapproval expressed in several academic journals, that an extraterritorial apprehension is "unreasonable," and hence, unauthorized, when it violates international law. *Id.* at 552. In substance, though not explicitly, the 1980 Opinion relies on the canon of statutory interpretation — enunciated in *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) — that a

---

[11] Because customary international law consists of evolving state customs and practice, it is an inherently uncertain area of law, from which clear rules rarely emerge Some extraterritorial law enforcement actions in which the FBI might engage without the foreign country's consent would not necessarily contravene international law. For instance, because sovereignty over territory derives not from the possession of legal title, but from the reality of effective control, *see* Brownlie, *supra*, at 117-18, logic would suggest there would be no violation of international law in exercising law enforcement activity in foreign territory over which no state exercises effective control In addition, if the United States were the target of attacks that violated international law, it would be justified in making a proportional unilateral response, even though its actions might otherwise be contrary to international law *See generally* Restatement (Third), *supra*, § 905(1); U.N. Charter art 51 (recognizing a nation's inherent right of self-defense). Other circumstances may exist, as well, under which extraterritorial law enforcement is appropriate under international law. *See generally* D Cameron Findley, *Abducting Terrorists for Trial in the United States. Issues of International and Domestic Law*, 23 Tex Int'l L J. 1, 25 (1988) (discussing other such circumstances) In addition, some unilateral actions by the United States, though inconsistent with prior international practice, may constitute justifiable efforts by the United States to shape the content of international norms. Such unilateral actions may be legitimate means by which the United States signals its rejection of a putative norm or seeks to gain acceptance for an alternative norm.

statute should be construed when possible so as not to conflict with international law.[12] We believe this line of analysis is wholly inapposite.

First, this canon does not apply to the kind of statutes at issue here. Sections 533(1) and 3052 are broad authorizing statutes "carrying into Execution" core Executive powers. *See* U.S. Const. art I, § 8, cl. 18. In creating the FBI and conferring on it broad investigative and arrest authority, Congress has created an agency through which the President carries out his constitutionally assigned law enforcement functions. Such general enabling statutes, in the absence of an explicit restriction, must be read as conferring on the agency a scope of authority commensurate with that of the Executive. Because, as part of his law enforcement powers, the President has the inherent authority to override customary international law, it must be presumed that Congress intended to grant the President's instrumentality the authority to act in contravention of international law when directed to do so. Unless Congress places explicit limitations on the FBI's investigative and arrest powers, it must be presumed that Congress did not intend to derogate from Presidential authority by limiting those statutory powers.[13]

This presumption is all the more compelling where, as here, the President's foreign relations powers are implicated. Courts have long recognized that delegations of discretion involving the President's constitutional powers must be construed broadly, especially in matters involving foreign affairs. *See e.g., Dames & Moore v. Regan*, 453 U.S. 654, 677 (1981) (Hostage Act and International Emergency Economic Powers Act,

---

[12] Actually, *Murray v. Schooner Charming Betsy*, 6 U S. (2 Cranch) 64 (1804), and *Lauritzen v Larsen*, 345 U S. 571, 578 (1953), are examples of cases applying the general rule of construction that prescriptive statutes not expressly purporting to apply extraterritorially ordinarily will not be presumed to have such an effect The presumption arises in those cases where it is apparent that extraterritorial application of a legal prohibition would gratuitously interfere with the sovereignty of foreign countries, while not advancing the United States' interest in preserving its own sovereignty In *Schooner Charming Betsy*, for example, the Court held that a non-intercourse act prohibiting trade between the United States and France could not be applied to justify seizure of a Danish ship 6 U.S (2 Cranch) at 118. To do so would have needlessly infringed on Danish sovereignty without protecting the interest of the United States in prohibiting its own citizens from trading with an enemy. However, such cases certainly cannot be read as suggesting that Congress does not have the *power* to enact statutes with extraterritorial effect. Nor do such cases apply where Congress actually intends a statute to have extraterritorial reach *See Blackmer v. United States*, 284 U S. at 437, *United States v. King*, 552 F.2d at 850-51.

[13] The court in *United States v Postal*, 589 F.2d 862 (5th Cir.), *cert denied*, 444 U.S. 832 (1979), recognized the need to apply enforcement statutes broadly to effectuate Congress' intent to reach certain drug trafficking. It held that the statute granting the power to search and seize vessels in all cases in "'which the United States has jurisdiction,'" for purposes of enforcing United States law, granted authority to the Coast Guard to seize vessels in violation of Article 22 of the Convention on the High Seas *Id* at 884 (quoting 14 U S C. § 89(a) (1976)). (The United States was a party to that Convention, but the Court held it was non-self-executing) The Court based this conclusion on an earlier decision in which it had construed the statute as granting "jurisdiction" in the type of case at issue — a conspiracy to violate federal narcotics statutes. *Id.* at 884. Indeed, since the court viewed the statute as "'intended to give the Coast Guard the broadest authority available under law,'" it held that a Coast Guard regulation requiring boarding of vessels only in conformity with a treaty could not be applied to limit the Coast Guard's authority under the statute. *Id* at 885 (quoting *United States v. Warren*, 578 F 2d 1058, 1068 (5th Cir. 1978) (en banc))

172

although not providing specific authorization for the President's actions, are still relevant because they "indicat[e] congressional acceptance of a broad scope for executive action" in settling claims against Iran); *Sardino v. Federal Reserve Bank of New York*, 361 F.2d 106, 111 (2d Cir.), *cert. denied*, 385 U.S. 898 (1961) (noting that especially with respect to foreign affairs, statutory delegations of power to the President must be read more broadly than other delegations). *See Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 110-14 (1948) (denying availability of judicial review over presidential decisions based on statutory authority involving broad foreign policy matters); *see also United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) (upholding broad statutory delegation that implicated President's foreign affairs responsibilities).[14]

In contrast, the 1980 Opinion reverses the presumptions of our constitutional system. The Opinion imputes to Congress an intent to make the scope of domestic legal authority for law enforcement operations depend on the vague and fluctuating standards of international custom. In effect, this would delegate to foreign nations the power to define, on a continuing basis, the content of United States law, according to standards that are outside the direct control of the political branches. Such an intent should not be presumed. To the contrary, Congress must be presumed to entrust such vital law enforcement decisions directly to the democratically accountable President and his subordinates. *See Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) (holding that it is for the executive branch, not the judiciary, to make policy choices within the ambit of delegated statutory authority when Congress has not spoken).

In enacting sections 533(1) and 3052, Congress was legislating against the background of the well-recognized principle that international law is part of the law of the United States only insofar as it has not been overridden by actions of the political branches. In *The Paquete Habana*, Justice Gray stated:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty, and *no controlling exec-*

---

[14] Two recent cases refusing to apply statutory enforcement jurisdiction abroad are inapposite. *See Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 493 (D.C. Cir. 1984) (CFTC could not enforce investigative subpoena on foreign citizen in a foreign nation), *FTC v. Compagnie de Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1324-27 (D C Cir 1980) (FTC could not enforce document subpoena on a foreign citizen residing abroad). In each case, the agency whose authority was at issue was an independent agency that exercised statutory authority thought to be shielded from direct presidential control. Thus, the statutory authorities at issue in those cases, unlike those exercised by the FBI, may not have been understood to effectuate directly the President's constitutional authority, and thus need not be interpreted as commensurate with that authority.

*utive or legislative act* or judicial decision, resort must be had to the customs and usages of civilized nations ....

175 U.S. at 700 (emphasis added). Thus, the Court held that United States forces unlawfully had seized Cuban fishing vessels as prizes of war where such vessels were "exempt by the general consent of civilized nations from capture, and ... no act of Congress or order of the President ha[d] expressly authorized [such an action] to be taken." *Id.* at 711.

In 1986, the Eleventh Circuit applied *The Paquete Habana* to uphold executive branch action taken pursuant to a broad statutory delegation in circumstances analogous to those here. In *Garcia-Mir v. Meese*, 788 F.2d 1446 (11th Cir.), *cert. denied*, 479 U.S. 889 (1986), the issue was whether the United States was authorized to detain indefinitely Cuban aliens who had arrived as part of the Mariel boatlift, notwithstanding that such a detention violated customary international law.

The Attorney General ordered the detention pursuant to 8 U.S.C. § 1227(a), which, like 28 U.S.C. § 533(1) and 18 U.S.C. § 3052, contained a broad grant of authority to the Attorney General, but did not specifically authorize indefinite detention.[15] With respect to one group of the Mariel detainees, the court concluded that there was insufficient evidence of an express congressional intention to override international law. *Id.* at 1453-54.[16] The court found, however, that the Attorney General's decision to incarcerate them indefinitely constituted a "controlling executive act" of the kind required by *The Paquete Habana,* and the court thus found that the detention was lawful. *Id.* at 1454. *Garcia-Mir* therefore may be understood as holding that the Executive acting within broad statutory discretion may depart from customary international law, even in the absence of an affirmative decision by Congress that international law may be violated.[17] Accordingly, we believe that *Garcia-Mir* provides

---

[15] The relevant portion of 8 U S.C § 1227(a) provides that "[a]ny alien     arriving in the United States who is excluded under this chapter, shall be immediately deported, . . unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper."

[16] As to another group of Mariel Cubans — those who had been incarcerated continuously since their arrival in the United States — the court concluded that Pub L No. 96-533, tit VII, § 716, 94 Stat. 3131, 3162 (1980), provided sufficient evidence of congressional intention to override international law. *See* 788 F.2d at 1453-54 n 9.

[17] There are two different ways to read the holding in *Garcia-Mir*. One is that the Executive has broad discretionary authority, pursuant to general power delegated by statute, to determine whether to act inconsistently with international law Certain language in the district court's decision suggests that it viewed the "controlling executive act" as having been taken pursuant to statutory authorization. *See Fernandez-Roque v. Smith*, 622 F. Supp 887, 903 (N D. Ga. 1985) ("[T]his Court is reluctant to hold that the Attorney General's involvement in plaintiffs' detention cannot be considered a 'controlling executive act,' especially since Congress has delegated to the Attorney General broad discretion over the detention of unadmitted aliens.") In affirming, the Eleventh Circuit may have intended to adopt the statutory rationale

Alternatively, *Garcia-Mir* may be understood as holding that the President has inherent constitutional authority, independent of the statutory grant of power, to determine whether to act inconsistently with international law. The Eleventh Circuit quoted a draft of the Restatement referring to the President

Continued

additional support for the proposition that broad statutory grants of Executive authority must be interpreted in light of the political branches' inherent power to override international norms.[18]

In sum, then, we conclude that the FBI has authority under sections 533(1) and 3052 to carry out overseas investigations and arrests that contravene customary international law. Those statutes do not explicitly require the FBI to conform its activities to customary international law, and there is no basis for gratuitously assuming that Congress intended to impose such limitations on the FBI. On the contrary, in view of the President's authority to override customary international law, it must be presumed that Congress granted the FBI commensurate statutory authority.[19]

---

[17] (...continued)

"acting within his constitutional authority" in support of its holding, see 788 F.2d at 1454-55, and it may therefore have been relying on the President's inherent constitutional authority This is the interpretation of *Garcia-Mir* adopted by the Restatement (Third), *supra*, § 115, note 3, and particularly by the Chief Reporter. *See* Louis Henkin, *The Constitution and United States Sovereignty A Century of Chinese Exclusion and Its Progeny*, 100 Harv. L. Rev. 853, 883-86 (1987) ("Henkin"). We think that the decision in *Garcia-Mir* is correct under either interpretation

Professor Henkin disagrees with the result in *Garcia-Mir* because he does not believe that the President has an inherent constitutional authority to exclude aliens. *See id* at 884 n 131. We disagree on this specific point with Professor Henkin. *See United States ex rel Knauff v. Shaughnessy*, 338 U S. 537, 543 (1950) ("[T]he power of exclusion of aliens is also inherent in the executive department of the sovereign .."); *see also Nishimura Ekiu v. United States,* 142 U S. 651, 659 (1892). In any event, this debate pertains only to the particular issue in *Garcia-Mir;* it does not go to the basic question of whether the President has inherent constitutional authority to violate customary or other international law — a proposition with which both the Restatement (Third) and Professor Henkin agree. Restatement (Third), *supra*, § 115, note 3; Henkin, *supra*, at 882 ("Thus, a domestic court espousing this view would not, for example, enjoin the President from directing United States officers to overfly another country's territory without that country's consent ... or to kidnap a wanted criminal from a foreign country . [but] would have to accept such directives as an exercise by the President of the prerogative of the United States to take such measures regardless of its international obligations.").

[18] Recent legislation reflects Congress' intent that the United States be able to exercise its law enforcement powers abroad when necessary to counter international terrorism. For instance, in introducing legislation (now codified at 18 U S C § 2331) to criminalize murder and other acts against U S. nationals committed abroad, Senator Specter noted that

> In many cases, the terrorist murderer will be extradited or seized with the cooperation of the government in whose jurisdiction he or she is found Yet, if the terrorist is hiding in a country like Lebanon, where the government, such as it is, is powerless to aid in his removal, or in Libya, where the Government is unwilling, we must be willing to apprehend these criminals ourselves and bring them back for trial

131 Cong Rec. 18,870 (1985)

[19] We do not here discuss limitations on the scope of the FBI's authority for such actions that may be derived from other statutes We know of no provisions by which Congress generally has prohibited the use of agents to enforce United States laws contrary to principles of customary international law. We believe, however, that such provisions would have to be quite explicit before they would be so construed, because the extraterritorial enforcement of United States laws relates to two areas of the President's constitutional authority — the conduct of foreign relations and his duty to execute the laws *See Youngstown Sheet & Tube Co v Sawyer*, 343 U S. 579, 645 (1952) (Jackson, J., concurring) ("I should indulge the widest latitude of interpretation to sustain [the President's] exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society."). For example, we do not believe that the Mansfield Amendment circumscribes the FBI's authority to make arrests abroad for violations of United States anti-drug laws, because its restrictions relate solely to United States participation in operations to enforce *foreign* anti-drug laws *See* 22 U S C § 2291(c).

175

## C. The President's Constitutional Power to Authorize Actions Inconsistent with Customary International Law

We believe that the 1980 Opinion also erred because it failed to consider the President's inherent constitutional power to authorize law enforcement activities. Pursuant to the constitutional command to "take Care that the laws be faithfully executed,"[20] the President has the power to authorize agents of the executive branch to engage in law enforcement activities in addition to those provided by statute.

The Court so held in *In re Neagle*, 135 U.S. 1 (1890). There, the life of Justice Field had been threatened, and as a result, the Attorney General assigned a Deputy United States Marshal to accompany the Justice. *Id.* at 42-52. While performing the duties assigned to him by the Attorney General, Neagle shot and killed a man whom he believed was about to attack Justice Field. *Id.* at 52-53. Neagle was arrested and charged with murder by California authorities.

The Court assumed that the authorizing statute did not empower the U.S. Marshals or their deputies to accompany and guard Supreme Court Justices as they traveled through their circuits. *Id.* at 58. Nevertheless, the Court held that the constitutional command that the President "shall take Care that the laws be faithfully executed" gave him the power to authorize agents of the executive branch to take enforcement actions in addition to those provided by statute. *Id.* at 63-64. The Court concluded that the President's constitutional duty is not limited to the enforcement of acts of Congress or treaties according to their terms, but that it extends also to the "rights, duties and obligations growing out of the Constitution itself, our international relations, and all the protection implied by the nature of the government under the Constitution." *Id.* at 64-67. The Court thus concluded that the President had the legal authority, acting through the Attorney General, to direct the Deputy Marshal's actions, and that the authority overrode any contrary California law. *Id.* at 67-68.[21]

---

[20] U.S. Const. art. II, § 3.

[21] *See also United States ex rel Martinez-Angosto v. Mason*, 344 F.2d 673, 688 (2d Cir. 1965) (Friendly, J., concurring) (noting that congressional silence did not preclude the inference that the President has the power to decide whether to follow provisions of a non-self-executing treaty)

*Durand v. Hollins*, 8 F. Cas. 111 (C C.S D N Y. 1860) (No. 4,186) is also apposite. In 1854, Lieutenant Hollins of the U.S.S. Cyane ordered the bombardment of Greytown, Nicaragua in retaliation for the failure of local authorities to make reparation for a mob attack on the United States Consul. Hollins was then sued for the value of property alleged to have been destroyed in the bombardment Justice Nelson, on circuit, held Hollins not liable on the grounds that he was acting pursuant to orders of the President and the Secretary of the Navy He ruled that

As the Executive head of the nation, the President is made the only legitimate organ of the general government, to open and carry on correspondence or negotiations with foreign nations, in matters concerning the interests of the country or of its citizens It is to him, also, that citizens abroad must look for protection of person and of property, and for the faithful

Continued

176

The *Neagle* Court pointed particularly to the President's power in the area of foreign affairs as an area in which there exists considerable inherent presidential power to authorize action independent of any statutory provision. *See id.* at 64. The Court's decision reflects the fundamental principle stated by John Jay that "[a]ll constitutional acts of power, whether in the executive or in the judicial department, have as much legal validity and obligation as if they proceeded from the legislature." The Federalist No. 64, at 394 (John Jay) (Clinton Rossiter ed., 1961).

This Office also has previously opined that the President, pursuant to his inherent constitutional authority, can authorize enforcement actions independent of any statutory grant of power. *See* Memorandum for Wayne B. Colborn, Director, United States Marshals Services, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Law Enforcement Authority of Special Deputies Assigned to DOT to Guard Against Air Privacy* (Sept. 30, 1970) (the "1970 Opinion"). In that opinion, this Office ruled that the President's inherent constitutional authority permitted Department of Transportation personnel to be deputized as Deputy U.S. Marshals and authorized to carry firearms, to take necessary action to prevent air piracy while an American carrier is in flight anywhere in the world, and to make arrests for violations of United States laws regarding air piracy and related offenses. *Id.* at 1. The opinion recognized that there was no statute expressly authorizing this protection and enforcement action. *Id.* at 2.[22] Relying on *In re Neagle* and *In re Debs*, 158 U.S. 564, 581 (1895), however, it concluded that "since the United States has jurisdiction to punish air piracy and related offenses, it likewise has inherent authority to take reasonable and necessary steps to prevent these offenses." 1970 Opinion at 2-3. In its analysis, the 1970 Opinion noted that "the exercise of their authority ... could give rise to conflicts with the countries involved of an international nature. But this would not, in

---

[21] ( continued)
execution of the laws existing and intended for their protection. For this purpose, the whole executive power of the country is placed in his hands, under the constitution, and the laws passed in pursuance thereof; and different departments of government have been organized, through which this power may be most conveniently executed, whether by negotiation or by force — a department of state and a department of the navy.

Now, as respects the interposition of the executive abroad, for the protection of the lives or property of the citizen, the duty must, of necessity, rest in the discretion of the president Acts of lawless violence, or of threatened violence to the citizen or his property, cannot be anticipated and provided for, and the protection, to be effectual or of any avail, may, not unfrequently, require the most prompt and decided action. Under our system of Government, the citizen abroad is as much entitled to protection as the citizen at home The great object and duty of government is the protection of the lives, liberty, and property of the people composing it, whether abroad or at home, and any government failing in the accomplishment of the object, or the performance of the duty, is not worth preserving

*Id* at 112

[22] The authorizing statute of the U S. Marshals, 18 U S.C. § 3053, like 28 U S C § 33(1) and 18 U S.C § 3052, contains no express extraterritorial arrest or enforcement authority

our view, affect the legality of their actions under U.S. domestic law." *Id.* at 6.[23]

Accordingly, we believe that even if sections 533(1) and 3052 are construed as authorizing enforcement action only within the limits imposed by international law, the President retains the constitutional authority to order enforcement actions in addition to those permitted by statute. As discussed *supra* pp. *168-71*, this constitutional authority carries with it the power to override customary international law. Thus, Executive agents, when appropriately directed pursuant to the President's constitutional law enforcement authority, may lawfully carry on investigations and make arrests that contravene customary international law.

## D. The Status of Article 2(4) of the U.N. Charter and Other Unexecuted Treaties or Treaty Provisions

To this point, we have discussed the Executive's power to override customary international law. Another issue is whether Article 2(4) of the U.N. Charter would prohibit the Executive as a matter of domestic law from authorizing forcible abductions absent acquiescence by the foreign government.[24] We do not believe that it does.

The text of Article 2(4) does not prohibit extraterritorial law enforcement activities, and we question whether Article 2(4) should be construed as generally addressing these activities. Nevertheless, even if Article 2(4) were construed as prohibiting certain forcible abductions, we believe that the President has the authority to order such actions in contravention of the Charter.

Treaties that are self-executing can provide rules of decision for a United States court,[25] *see Cook v. United States*, 288 U.S. 102, 112 (1933), but when a treaty is non-self-executing, it "addresses itself to the political, not the judicial department; and the legislature must execute the [treaty] before it can become a rule for the Court." *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.). Accordingly, the decision whether to act consistently with an unexecuted treaty is a political issue

---

[23] We understand that as a matter of international law the United States may exercise jurisdiction on United States carriers flying over foreign territories Convention on Offenses and Certain Other Acts Committed On Board Aircraft, Sept. 14, 1963, art. 3, 20 U S.T. 2941, 2944 The 1970 Opinion, however, did not rely on the Convention and, to the contrary, appeared to assume that exercise of such jurisdiction would be viewed as infringing on the sovereignty of other nations.

[24] Article 2(4) provides:

All Members shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations.

U.N. Charter, art 2, ¶ 4.

[25] *See* Restatement (Third), *supra*, § 111, introductory note (declaring that "[u]nder the Supremacy Clause, self-executed treaties concluded by the United States become law of the United States"), *id* § 111, comment h (noting that unexecuted treaty does not furnish a rule of decision in the United States).

rather than a legal one,[26] and unexecuted treaties, like customary international law, are not legally binding on the political branches. The President, acting within the scope of his constitutional or statutory authority, thus retains full authority to determine whether to pursue action abridging the provisions of unexecuted treaties.[27]

We agree with the 1980 Opinion that Article 2(4) is not self-executing.[28] 4B Op. O.L.C. at 548. *See also Sei Fujii v. State*, 242 P.2d 617, 620 (Cal. 1952) (human rights provisions of U.N. Charter not self-executing); *Pauling v. McElroy*, 164 F. Supp. 390, 393 (D.D.C. 1958), *aff'd*, 278 F.2d 252 (D.C. Cir.), *cert. denied*, 364 U.S. 835 (1960) (finding other sections of Charter not self-executing). Article 2(4) relates to one of the most fundamentally political questions that faces a nation — when to use force in its international relations. For these reasons, we conclude that as a matter of domestic law, the Executive has the power to authorize actions inconsistent with Article 2(4) of the U.N. Charter.[29]

## E. The President's Ability to Delegate to the Attorney General the Power to Authorize Enforcement Actions Inconsistent with International Law

Even though the Constitution vests the "executive power" in the President, *see* U.S. Const. art. II, § 1, we do not believe that the President's statutory or constitutionally based Executive power to override customary or other international law can be exercised only by him. Rather, we believe that this Executive power can be exercised by the Attorney General as well, and that this conclusion obtains regardless of whether

---

[26] Of course, there may be significant political reasons for not abridging an unexecuted treaty, just as the President may decide it is politically unwise to act inconsistently with customary international law. Such political decisions necessarily depend on the facts of each case, and we do not address their ramifications here.

[27] As discussed above, law enforcement activities outside the United States implicate the President's constitutional authority to conduct the international relations of the United States and to execute our laws Pursuant to these constitutional authorities, the President has the power to decide whether or not to operate within the terms of an unexecuted treaty If the President acts inconsistently with the terms of a treaty, the treaty is not automatically terminated. It may simply mean that the treaty is rendered inoperative to the extent it is inconsistent with the President's actions. In any event, the determination of whether a treaty has been rendered inoperative is largely a decision made by the Executive as part of the conduct of the foreign relations of the United States. *Cf Charlton v Kelly*, 229 U S 447 (1913) (holding that the President must decide whether the actions of a foreign government have voided a treaty)

[28] The 1980 Opinion speaks somewhat loosely of the U N Charter not being "a self-executing treaty." 4B Op. O L C at 548. More properly, the question should be whether individual provisions of the treaty are self-executing *See, e g , United States v Postal*, 589 F.2d at 884 n 35.

[29] We do not address the effect on the FBI's authority of treaties that have become part of United States law, either because they are self-executing or because they have been implemented by legislation. As noted above, such treaties do have domestic legal effect, although they can be denounced by the Executive. *Cf The Chinese Exclusion Case*, 130 U S. 581 (1889). *See also* Louis Henkin, *Foreign Affairs and the Constitution, supra*, at 171 We are unaware, however, of any treaties of general application that would limit the law enforcement authority of the United States. Applicable treaties should, of course, be examined in the context of any particular operation.

179

the authority is viewed as derived from statute or from the President's inherent constitutional authority.

Section 533(1) designates the Attorney General as the responsible executive branch official. Thus, all enforcement action authorized pursuant to this statute, including enforcement action that departs from customary or other international law, may be undertaken by the Attorney General.[30] The *Garcia-Mir* decision, confirmed this conclusion by holding that the Attorney General performed the "controlling executive act" that sufficed to override customary international law in that case. 788 F.2d at 1454-55.

The Attorney General also may exercise the President's constitutional power to override customary international law because "[t]he President speaks and acts through the heads of the several departments in relation to subjects which appertain to their respective duties." *Wilcox v. Jackson*, 38 U.S. (13 Pet.) 498, 513 (1839). *See also Wolsey v. Chapman*, 101 U.S. 755, 769 (1879). Specific direction from the President, or even explicit invocation of his authority, cannot reasonably be expected and is not generally required. 7 Op. Att'y Gen. 453, 480-82 (1855).[31]

Thus, we believe that the Attorney General has the power to authorize departures from customary or other international law in the course of law enforcement activities and that the President need not personally approve such actions. We would not recommend, however, that the Attorney General delegate the authority to more subordinate officials. Even if he is viewed as exercising statutory authority pursuant to section 533(1) or section 3052, we think that as a prudential matter the Attorney General should, in this case, exercise it personally. Decisions such as *Garcia-Mir* rely on the theory that the Executive has the constitutional authority to make political decisions affecting our international relations. To the extent that such decisions are made by officials below cabinet rank, however, the factual basis for this theory may be weaker.

Specifically, we recommend that any overseas law enforcement activity that presents a significant possibility of departing from customary or other international law be approved directly by the President or the Attorney General. As an administrative matter, the Attorney General may

---

[30] The same is true with respect to section 3052.

[31] *In re Neagle*, provides an example of a case in which the Court upheld the exercise by the Attorney General of the President's inherent constitutional authority 135 U.S at 67-68. More recent examples are the cases upholding the President's constitutional authority to order warrantless wiretaps relating to foreign intelligence activities. *United States v. Butenko*, 494 F.2d 593 (3d Cir.) (en banc), *cert denied*, 419 U.S. 881 (1974), *United States v. Brown*, 484 F 2d 418 (5th Cir. 1973), *cert denied*, 415 U.S. 960 (1974); *United States v. Truong*, 629 F.2d 908 (4th Cir. 1980), *cert denied*, 454 U S 1144 (1982); *United States v Buck*, 548 F.2d 871 (9th Cir.), *cert denied*, 434 U.S. 890 (1977). In all of these cases, the warrantless wiretaps were ordered by the Attorney General, and the courts accepted his authority to act on behalf of the President. *See also United States v. Ehrlichman*, 546 F 2d 910, 925-26 (D C Cir. 1976), *cert denied*, 429 U S. 1120 (1977) (holding that, if a national security exception for warrantless foreign intelligence searches exists, such searches must be authorized by the President or by "his alter ego for these matters, the Attorney General").

wish to promulgate guidelines specifying what actions could be taken by the FBI overseas, when consent should be obtained from foreign governments, and when such consent need not be obtained. Such guidelines also could provide general authorization for certain types of non-intrusive law enforcement activities (such as interviews with informants) in foreign countries that nonetheless might depart from customary international law if not authorized by the foreign government. Nevertheless, it would be prudent for such guidelines to require individual approval by the Attorney General for any operation, such as an apprehension and abduction, that would involve the use of force in the territory of another country without that country's consent.

## F. International and Foreign Law and the Fourth Amendment

The 1980 Opinion concluded that an arrest in violation of customary international law did not violate the Fourth Amendment.[32] 4B Op. O.L.C. at 554 n.34. We agree. The Opinion did not address whether the violation of foreign statutes or other law would create a Fourth Amendment violation.[33] We conclude that it would not.

The central question is whether an arrest that violates international law or foreign statutory law is "unreasonable" within the meaning of the Fourth Amendment's proscription of unreasonable searches and seizures. The Fourth Amendment is an autonomous rule of federal law that represents a judgment by the United States as to the appropriate balance between individual rights and the authority of the government to enforce the law. The Court recently held that state standards for reasonable searches and seizures are irrelevant to determining whether the

---

[32] The Bill of Rights applies to actions of American officials directed at American nationals overseas *Reid v Covert,* 354 U S 1, 5-6 (1957). There remains some dispute as to the extent to which the Bill of Rights, particularly the Fourth Amendment, applies to actions of American officials directed at non-resident aliens overseas *Compare* Steven A. Saltzburg, *The Reach of the Bill of Rights Beyond the Terra Firma of the United States,* 20 Va J. Int'l L. 741 (1980) ("Saltzburg") *with* Paul B. Stephan III, *Constitutional Limits on International Rendition of Criminal Suspects,* 20 Va J Int'l L. 777 (1980) ("Stephan") *and* Paul B Stephan III, *Constitutional Limits on the Struggle Against International Terrorism: Revisiting the Rights of Overseas Aliens,* 19 Conn L. Rev 831 (1987) The Supreme Court recently granted certiorari in a case holding the Fourth Amendment applicable to warrantless searches by DEA officials of foreign nationals in their own country. *United States v. Verdugo-Urquidez,* 856 F 2d 1214 (9th Cir 1988), [*rev'd,* 494 U S. 259 (1990)]. We are addressing here, however, only the general question of whether a violation of foreign or international law results in a violation of the Fourth Amendment, regardless of whether the individual arrested is a citizen or alien

[33] Presumably this omission was based on the Opinion's conclusion that the FBI had "the authority to violate the local law of another country as long as that country does not object." 4B Op O.L.C at 552 n.29 This conclusion was principally based on the notion that it is for the sovereign, not an individual, to determine whether objection should be made to an infringement on sovereignty *Id.* While we think this analysis correctly resolves any question of violation of international law, it does not necessarily answer the Fourth Amendment question, for it is at least theoretically possible that the Fourth Amendment itself contains a requirement that arrests comply with applicable foreign laws If such a right were contained in the Fourth Amendment, it is difficult to see how a foreign government could extinguish the individual's right by failing to object. We address this issue in the text *infra*

Fourth Amendment has been violated. *California v. Greenwood*, 486 U.S. 35 (1988). The Court stated:

> We reject respondent['s] ... alternative argument for affirmance: that his expectation of privacy ... should be deemed reasonable as a matter of federal constitutional law because the warrantless search and seizure ... was impermissible as a matter of California law.... We have never intimated ... that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.... Respondent's argument is no less than a suggestion that concepts of privacy under the laws of each State are to determine the reach of the Fourth Amendment. We do not accept this submission.

*Id.* at 43-44. *See also Oliver v. United States*, 466 U.S. 170, 183-84 (1984) (police officers who trespassed upon posted and fenced land did not violate the Fourth Amendment, even though their action was subject to criminal sanctions); *Olmstead v. United States*, 277 U.S. 438, 466-69 (1928) (illegality of a wiretap under state law irrelevant in considering whether evidence was inadmissible under the Fourth Amendment); *Hester v. United States*, 265 U.S. 57, 59 (1924) (trespass in "open fields" does not violate the Fourth Amendment). By analogy, the standards imposed by the Fourth Amendment, insofar as it applies abroad, *see Reid v. Covert*, 354 U.S. 1, 5-6 (1957), must be determined by United States law.

It would be contrary to the Fourth Amendment's purpose to incorporate into it rules of international law or analogous foreign statutes authorizing only local law enforcement officers to investigate and arrest. Such laws would have as their purpose the protection of another country's sovereignty. In contrast, the Fourth Amendment is concerned with the protection of individual rights. As the Fifth Circuit has stated:

> Whether the search and seizure were Fourth-Amendment-unreasonable must be established by showing that the interests to be served by the Fourth Amendment were violated, and not merely by establishing the violation of general principles of international law.

*United States v. Cadena*, 585 F.2d 1252, 1264 (5th Cir. 1978).[34]

---

[34] In *United States v. Peterson*, 812 F.2d 486 (9th Cir. 1987), the court reviewed whether evidence derived from wiretaps illegal under Philippine law was subject to the exclusionary rule. Without analysis, the court stated that the "local law of the Philippines governs whether the search was reasonable." *Id.* at 491. We do not accept this automatic incorporation of local law into the Fourth Amendment, because it is inconsistent with *California v. Greenwood*, 486 U.S. 35 (1988). Moreover, the statement in *Peterson* was of no consequence to the decision because the court proceeded to admit the evidence under the good faith exception to the exclusionary rule. 812 F.2d at 491-92.

We believe that the requirements of the Fourth Amendment are met when officers with authority under United States law arrest with probable cause.[35] *See United States v. Reed*, 639 F.2d 896, 902 & n.2 (2d Cir. 1981). Section 3052 of title 18 authorizes agents of the FBI to arrest without warrant if probable cause exists, which is all the Constitution requires, at least for an arrest in a public place. *United States v. Watson*, 423 U.S. 411, 414-17 (1976); *Henry v. United States*, 361 U.S. 98, 100 (1959).[36]

Accordingly, we conclude that an arrest in violation of foreign law does not violate the Fourth Amendment.[37] In addition, based on the analysis in the 1980 Opinion, we reaffirm that an arrest departing from international law does not violate the Fourth Amendment.

## IV. Conclusion

This Office concludes that at the direction of the President or the Attorney General the FBI may use its statutory authority under 28 U.S.C. § 533(1) and 18 U.S.C. § 3052 to investigate and arrest individuals for violations of applicable United States law, even if those actions depart from customary international law or unexecuted treaties. Moreover, we conclude that the President, acting through the Attorney General, has inherent constitutional authority to deploy the FBI to investigate and arrest individuals for violations of United States law, even if those actions contravene international law. Finally, we conclude that an arrest that is

---

[35] There is some doubt whether the Fourth Amendment standard includes a requirement of domestic law authority to arrest. The 1980 Opinion concluded that it does 4B Op O L C at 553-54. That Opinion relied principally on *United States v. Di Re*, 332 U S 581, 589-92 (1948), a case involving exclusion of evidence obtained incident to an unauthorized arrest by federal officials. But it is not clear that *Di Re* was a Fourth Amendment decision, and it is also unclear that the Constitution requires statutory or other authority to arrest. *See* 1 Wayne R. LaFave, *Search and Seizure* § 1 5(b) at 107 (2d ed. 1987) (concluding that *Di Re* is not a Fourth Amendment case but "simply an instance of the court utilizing its supervisory power to exclude from a federal prosecution evidence obtained pursuant to an illegal but constitutional federal arrest"). *Cf* George E Dix, *Fourth Amendment Federalism: The Potential Requirement of State Law Authorization for Law Enforcement Activity*, 14 Am J. Crim L. 1, 10 (1987) ("There is considerable doubt .  as to whether the Court has . . committed itself to the position that the fourth amendment reasonableness of an arrest depends upon the existence of state law and the arrest's validity under that law."). In any event, as we have previously stated, we believe that authority exists for the Executive to authorize the FBI to make arrests in foreign countries

[36] As to an arrest in a non-public place, there are circumstances in which an arrest warrant is required. *Payton v New York*, 445 U S 573, 576 (1980). While presumably an arrest warrant often could be obtained, there are limitations to the extraterritorial jurisdiction of the magistrate's writ *See* 18 U.S C §§ 3041-3042 Commentators have questioned, however, whether the warrant requirements of *Payton* and other cases should apply overseas. *See* Saltzburg, *supra*, 20 Va J Int'l L. at 762; Stephan, *supra*, 20 Va. J Int'l L at 792 n.44

[37] We note that fear that our agents will be extradited for violations of foreign law during an enforcement operation authorized by the President or the Attorney General is not a warranted concern The Secretary of State always has discretion to refuse to extradite, even if the offense is covered by an extradition treaty entered into with another country *See* 18 U S C. § 3186 (Secretary of State "may" extradite the person committed under section 3184); *Sindona v Grant*, 619 F.2d 167 (2d Cir 1980), *Wacker v. Bisson*, 348 F.2d 602, 606 (5th Cir 1965).

183

inconsistent with international or foreign law does not violate the Fourth Amendment.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*